Filed 5/29/24  P. v. Wallace CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LEVESTER WALLACE, JR.,<br><br>    Defendant and Appellant. | A166181<br><br>(Alameda County<br>Super. Ct. No. 19CR004871) |

A jury convicted defendant Levester Wallace, Jr. of corporal injury to a relationship partner (Pen. Code,[1] § 273.5, subd. (a)) and false imprisonment by violence (§§ 236, 237, subd. (a)), both committed against his girlfriend T.S. The trial court imposed the four-year upper term for the corporal injury charge and imposed (but stayed under section 654) an eight-month term for false imprisonment.

On appeal, Wallace contends (1) the prosecutor committed misconduct during voir dire and during her rebuttal closing argument at trial; and (2) the court erred by imposing the upper term on the corporal injury charge, in part because it purportedly relied on aggravating factors that were not found true by the jury.  In connection with both arguments, Wallace asserts his trial

---

[1] Undesignated statutory references are to the Penal Code.

counsel provided ineffective assistance by failing to make sufficient objections.

We reject Wallace's arguments. We conclude, however, that it is necessary to modify the stayed sentence for count 2. We will affirm the judgment as modified.

## I. BACKGROUND

### A. *The Evidence Presented at Trial*

In February 2019, T.S. lived on the third floor in an apartment complex in Oakland. She lived with Wallace, whom she had been dating since May 2016. Wallace was six feet, two inches tall and weighed 360 pounds. T.S. was five feet, six inches tall and weighed 170 pounds.

T.S. testified about incidents of domestic violence that occurred prior to the February 2019 incident that was the basis of the charges in this case. In August 2017, T.S. and Wallace were in a car, and Wallace punched T.S. in the jaw. T.S.'s jaw "felt like it dislocated." T.S. asked Wallace, "What are you doing?" Wallace threatened to crash the car with both of them in it. T.S.'s jaw hurt for a week. She did not report the incident.

In March of 2018, in a parking lot outside T.S.'s home, Wallace grabbed T.S. by her hair and asked her where she had been. Wallace grabbed so tightly that he pulled T.S.'s hair and a few braided extensions out. He let go, but after they walked from the parking lot into the apartment, Wallace grabbed T.S.'s hair again. She dropped to the floor and onto her back, thinking he would let go, but he did not. Instead, he put his knee onto T.S.'s chest, which caused her pain, and he kept it there for some time. T.S. pleaded that "that was hurting" and that she "couldn't breathe." Wallace eventually got up. T.S.'s chest hurt for a "week or two after the incident."

2

On February 24, 2019, T.S. went to a parade celebrating African-American culture and a concert, both in downtown Oakland. She went home around 8:00 p.m. to change her clothes to go to a nightclub. Wallace was also at the apartment, and it seemed to T.S. that he had had a lot to drink. T.S. spent an hour at the apartment, then went out to the nightclub. She consumed alcohol and marijuana during the daytime events and at the nightclub.

T.S. returned to the apartment at around 2:00 a.m. on February 25, 2019. Wallace called T.S. a "bitch" and asked her where she had been. He grabbed her hair and put his face close to hers. After he let go and walked away, T.S. went to change into her pajamas.

While T.S. was changing her clothes, Wallace returned, said "Bitch, where the fuck have you been," and punched T.S. in the head. The force of the punch pushed T.S. back up against the wall. As her back was against the wall, Wallace approached, took "his hand and put it around [T.S.'s] throat and start[ed] squeezing really hard." T.S. dropped to the floor, and Wallace put both of his hands around her neck. T.S. was on the floor, and Wallace's body weight was on her, so she could not move. Wallace straddled T.S., sitting on her torso, making it difficult for her to breathe.

T.S. wriggled out from under Wallace and ran into the living room. Because she was not fully dressed, she did not leave the apartment. She tried to "negotiate" with Wallace so that he would not hurt her anymore or attack her again. Wallace asked T.S. for her cell phone, and she gave it to him. As he was going through her phone, T.S. put on some clothing.

T.S. then tried to leave the apartment, but Wallace blocked the door. T.S. felt like "it was life or death" for her. She pushed the screen out of a window and told Wallace that if he came near her, she would jump. She

climbed out and hung dangling from the outside of the window, holding onto the window ledge. Wallace walked toward the window. Seeing him approach, T.S. let go of the ledge and fell three stories to the ground.

When T.S. hit the ground, she "crumple[d]." She could not run away as she had initially planned. Both her heels had shattered. She started screaming for help. Wallace came out and grabbed T.S. by her hair. T.S. told him that she was hurt and could not move. Wallace then left.

T.S.'s neighbor Lynell Fields heard a "thump" and then heard T.S. scream for help. Fields ran to her window. She saw Wallace holding T.S.'s arm and pulling her down the hill. T.S. was crying and screaming, " 'He's trying to kill me. Help me. He's trying to kill me. Help me.' " Fields ran outside. She held T.S.'s hand and called 911.

Wallace's punch to T.S.'s head left her with a "knot" on her head for a week. T.S. had extensive injuries to her heels, which required surgery and physical therapy.

T.S. was initially taken by ambulance to the emergency department at Oakland's Highland Hospital. Among her injuries, medical staff noted a "three-by-three centimeter contusion," or "bruise," on T.S.'s head. They also noted that she felt "tender at the sternum" when "pressing on the breast bone." The medical records showed that T.S. showed "no obvious trauma" and "no pain" to her head, eyes, ears, nose, and throat, and no "jugular vein distention."

T.S. drank alcohol and smoked marijuana before the incident and felt "normal" and "functional." On cross-examination, she testified her first drink of alcohol was around 2:00 p.m. to 3:00 p.m. She had three to four drinks in total that day and three marijuana blunts. She testified she was not impaired or "drunk" that day.

4

At the hospital, medical staff noted that T.S. was intoxicated and "could not consent to service provisions due to intoxication." The "E-T-O-H" screening, or ethyl alcohol screening, was not completed because T.S. was intoxicated. Her blood alcohol level for ethyl alcohol was at a "0.191." A neurological evaluation of T.S. at the hospital produced normal results, including that T.S.'s speech was fluent and she answered questions appropriately.

A defense expert, Dr. Michael Laufer, testified that a woman who was five feet, six inches tall and weighed 170 pounds would need to have about 10 drinks to get to a blood alcohol level of 0.19. Dr. Laufer estimated that if a person had a 0.19 blood alcohol level at around 4:30 a.m., but stopped drinking alcohol before 2:00 a.m., the person's blood alcohol level would likely have been higher at the time of their last drink. When asked whether three to four drinks could get someone to a 0.19 blood alcohol level, Dr. Laufer stated, "it really depends on the pattern."

Dr. Laufer described various effects of alcohol. Alcohol slows reaction time and causes difficulty with perception, including leading to tunnel vision, where people "lose the ability to see the other things around the one thing that they're focusing on." Dr. Laufer testified that at a blood alcohol level of around 0.20, a person would be "profoundly sleepy," may fall asleep or fall over, and may have difficulty walking, as well as problems perceiving distances, time, and whether something is safe or unsafe.

Memory loss may occur at a 0.24 blood alcohol level, but " 'almost never less than [0].24.' " Dr. Laufer had previously testified that " 'with alcohol alone, in order to lose your memory, you have to get to the point [of] unconsciousness.' "

5

## B. *Procedural Background:  The Charges, Verdict, and Sentence*

A second amended information filed on July 12, 2022, charged Wallace with corporal injury to a relationship partner (§ 273.5, subd. (a); count 1) and false imprisonment by violence (§ 236; count 2).  As to each count, the information alleged several circumstances in aggravation, including that the crime involved great violence or great bodily harm (Cal. Rules of Court,[2] rule 4.421(a)(1)); the victim was particularly vulnerable (rule 4.421(a)(3)); and Wallace took advantage of a position of trust (rule 4.421(a)(11)).  The information alleged Wallace had four prior convictions—for corporal injury to a relationship partner (§ 273.5, subd. (a)), evading an officer with willful disregard for safety (Veh. Code, § 2800.2, subd. (a)), possession of a firearm by a felon (former § 12021, subd. (a)(1); now § 29800, subd. (a)(1)),[3] and possession for sale of cocaine base (Health & Saf. Code, § 11351.5).

On July 25, 2022, the jury found Wallace guilty of both charged offenses:  corporal injury under section 273.5, subdivision (a), and false imprisonment by violence under section 236.  The jury did not find, and was not asked to find, the aggravating circumstances that were alleged in the second amended information.

In a bifurcated court trial, the court found beyond a reasonable doubt that Wallace suffered the four prior convictions alleged in the second amended information.

---

[2] Undesignated rule references are to the California Rules of Court.

[3] "Former section 12021[, subdivision ](a)(1) was repealed operative January 1, 2012, but its provisions were reenacted without substantive change as section 29800, subdivision (a)(1)."  (*People v. Sanders* (2012) 55 Cal.4th 731, 734, fn. 2.)

On September 8, 2022, the court sentenced Wallace to the upper term of four years in prison for the count 1 conviction of corporal injury to a relationship partner (§ 273.5, subd. (a)). The court imposed an eight-month term for the false imprisonment charge in count 2, but stayed that term under section 654. As we discuss further below, in selecting the upper term for count 1, the court found Wallace's prior convictions were numerous (see rule 4.421(b)(2)) and stated it was imposing the upper term based on that finding.

Wallace appealed.

## II. DISCUSSION

### A. *Prosecutorial Misconduct*

Wallace contends the prosecutor committed misconduct during her rebuttal closing argument by referring to statements made in voir dire, by misstating the law about how the jurors should assess T.S.'s credibility (specifically as to whether they should consider her intoxication), and by vouching for T.S.'s credibility. In addition, Wallace suggests (in a less developed argument) that the prosecutor committed misconduct *during* voir dire through questions she posed to prospective jurors. We conclude that Wallace forfeited the claims of error and that there was no prejudicial misconduct in any event.

#### 1. Additional Background

##### a. *Voir Dire*

During voir dire, the prosecutor asked prospective jurors (partly through hypothetical questions) whether a person's consumption of alcohol or marijuana would affect the jurors' assessment of that person's testimony or character. For example, the prosecutor asked: "[L]et's say a witness were to testify that they consumed alcohol. Would that affect the way that you judge

their testimony?  Would that affect the way you would judge their character?"  A prospective juror (referred to by the parties as Juror 1) responded:  "I guess it could affect the credibility of their testimony if they were impaired somehow.  It would depend on what they were testifying to, and how intoxicated they might have been, and how much that might have impaired their ability to accurately observe and remember what they were testifying to.  But not credibility other than that.  Not sort of character."

As to marijuana, a different prospective juror (referred to by the parties as Juror 2) stated:  "I don't have any strong feelings about marijuana use or alcohol use, but I think that if there was a person who—I think it depends on the extent of use.  If there's someone who says they smoke marijuana, you know, every single day, I would probably have a judgment about their character.  [¶] . . . [¶] I think a lot of people use marijuana recreationally, occasionally.  I think that I have—I would have a feeling of someone who gets high every day.  I would feel, you know—I think that reflects on their character."

Another prospective juror (a juror we will call Juror 3), when asked whether a person's marijuana use would impact her view of the person's character, stated it would.  Asked to elaborate, Juror 3 stated:  "Because I personally do not do drugs. . . . And I don't know why, but it would affect my perception of that person.  And if they told me they do drugs, then I would personally—that would be a negative [effect] on my judgment of them doing drugs.  Because I think—view them—it's a negative for me to see—to have to be interacting with people at that level because I don't know what their level is.  But, you know, I try to maintain sober and they go into drugs.  I think there's something different and I don't know anything about drugs myself."  Juror 3 was excused.

b. *Closing Argument*

In his closing argument, defense counsel argued T.S. was not a credible witness, focusing in part on T.S.'s testimony that she was not impaired despite her drinking and marijuana use on the day of the incident. Counsel also argued the medical records did not show evidence of the strangulation about which T.S. testified. Counsel then referred to voir dire, stating the prosecution knew T.S. had "credibility issues" because "the district attorney asked about alcohol and marijuana use during voir dire and whether that would impact your assessment of [T.S.'s] character. You don't do that for someone who has three to four drinks over a 12-hour period. No one is worried about impugning someone's character who's had three or four drinks over a 12-hour period." Defense counsel stated he was not attacking T.S.'s character but was just arguing she was not a credible witness.

In her rebuttal closing argument, the prosecutor noted defense counsel had discussed alcohol, "[a]nd then he said I don't understand why [the prosecutor] talked to you about alcohol during voir dire. Of course I did, ladies and gentlemen. Of course I did. Studies show that jurors and people automatically don't believe victims when they learn that they're under the influence of alcohol or drugs—" Defense counsel stated he was objecting "to this as improper evidence. This is not evidence." The court overruled the objection, stating, "This is argument of counsel. If I've already indicated to the jurors that the argument of counsel is not evidence. This is counsel's interpretation of the case."

The prosecutor continued: "And we all know this from reading things in the newspaper, seeing things in the media. When people learn that a victim is under the influence of alcohol, they're no longer believed. We had a juror who was, I think, seated in number 18 for a period of time who said

9

that. She said if she learned that someone was using marijuana, she would automatically not be able to think that they were a good person or making good decisions. I can't remember exactly the word she used. She said she had all these feelings about marijuana usage and she said that it would affect her to the degree that she wouldn't be able to be a good juror in this case. [¶] [Wallace] is entitled to a fair trial, but so are the People. So is [T.S.]. A jury, of fair and impartial people. And each of you promised me at the beginning of this case that you would not hold it against [T.S.] the fact that she was drinking and smoking marijuana. [¶] Every single piece of evidence that you have heard over the course of this trial supports [T.S.]."

In arguing that the evidence supported T.S.'s credibility, the prosecutor stated T.S. had made prior statements that were consistent with her testimony; medical records reflected an injury to T.S.'s head; Fields witnessed some of the incident and testified about it; Wallace's actions after T.S. fell and he came outside (first grabbing T.S. again and then fleeing) supported that "there was domestic abuse inside of the apartment"; and Wallace had a prior conviction for domestic violence.

During this argument, the prosecutor made statements about T.S.'s credibility. As to T.S.'s statements to emergency personnel, the prosecutor stated: "Why would [T.S.] lie to them? You have to give accurate information to the people who are giving you medical care. She is telling the truth." Later, acknowledging inconsistencies between T.S.'s and Fields's statements (as to the words T.S. yelled after she fell, and as to whether Wallace grabbed T.S.'s hair or her arm after he came outside), the prosecutor stated "it's my argument that that makes their testimony more credible," because it was clear they were not collaborating to provide identical accounts.

The prosecutor later stated T.S. had been "open and honest" in admitting her drug and alcohol use and describing other incidents of domestic violence that she had not reported. The prosecutor stated "[a]ll of this gives her more credibility." Again noting that T.S. did not "get [Wallace] in trouble" after the two prior domestic violence incidents, the prosecutor stated: "Her goal is not to get the defendant [in] trouble. She is an extremely credible witness. You saw the emotion on her and [Fields's] faces when they testified in court." The prosecutor argued all the evidence supported T.S.'s testimony, while "the only alternative explanation" was not plausible—"that she jumped out of a window for no reason, breaking three bones," and she "immediately lied to the emergency personnel who arrived on scene to give her medical care, that she lied at the preliminary hearing, and now, more than three years later, she's lying again."

### 2. Legal Standards

"The standards under which we evaluate prosecutorial misconduct may be summarized as follows. A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

### 3. Analysis

Wallace contends that, in the prosecutor's rebuttal argument, she improperly vouched for T.S.'s credibility and made improper references to voir dire. Wallace also argues the prosecutor misstated the law (both in voir dire and in her rebuttal argument) as to how jurors should evaluate the impact of intoxication on T.S.'s credibility. We find no reversible error.

As an initial matter, we agree with the Attorney General that Wallace's arguments on this point are forfeited. A claim of prosecutorial misconduct is forfeited where the defense fails to " 'make a timely and specific objection to the alleged misconduct and request the jury be admonished to disregard it.' " (*People v. Peoples* (2016) 62 Cal.4th 718, 797 (*Peoples*).) "This rule applies to asserted prosecutorial misconduct committed during voir dire." (*People v. Medina* (1995) 11 Cal.4th 694, 740.) " 'A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile.' " (*Peoples,* at p. 797.)

Wallace acknowledges that his trial counsel did not object to the prosecutor's statements on the grounds he now raises on appeal and did not ask the court to admonish the jury that the statements were improper. Wallace makes a brief suggestion that objections might have been futile, but he does not develop this argument, and we reject it. (*Peoples, supra,* 62 Cal.4th at p. 797 ["Without greater specificity as to why this particular objection would have fallen upon deaf ears, we cannot conclude that it would have been futile for defendant to object to statements made during the . . . closing arguments."].)

In any event, we find no misconduct. First, the prosecutor did not improperly vouch for T.S.'s credibility. " ' "[A] prosecutor is given wide latitude to vigorously argue his or her case" ' [citation] and ' "may make

'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' " ' [Citation.] 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.)

As outlined above, the prosecutor argued in detail that *the evidence* supported T.S.'s credibility. This was proper argument. The prosecutor emphasized T.S.'s prior consistent statements, the medical evidence reflecting the injury to her head, Fields's testimony, Wallace's actions after the incident, and his prior conviction for domestic violence. The prosecutor did not suggest that evidence not available to the jury supported her argument and did not invoke her personal prestige or experience as a basis for the jury to find T.S. credible. And the prosecutor's specific statements highlighted by Wallace—that T.S. "is telling the truth" or "is an extremely credible witness"—were made during, and were based on, the prosecutor's argument that the evidence supported T.S.'s credibility.

Wallace argues, however, that the evidence cited by the prosecutor "did not resolve the issue of credibility," and T.S.'s intoxication "better explained" her actions in jumping out of the window. But it was not improper for the prosecutor to urge the jury to consider the evidence supporting T.S.'s testimony. As to the evidence of T.S.'s intoxication, defense counsel was free to (and did) argue that it provided a basis to discount T.S.'s credibility.

Turning to the prosecutor's statements about intoxication specifically, we again find no reversible error. Wallace takes issue with the prosecutor's statement in her rebuttal argument that jurors had "promised" that they

13

would not "hold it against" T.S. that she had been drinking and smoking marijuana. He also faults the prosecutor for quoting (or paraphrasing) the statements by a prospective juror (Juror 3, discussed above) about how she would view a witness who used drugs. Wallace asserts these and other statements in the prosecutor's rebuttal (as well as some of the prosecutor's earlier questions during voir dire) misstated the law as to whether a witness's intoxication may be considered in assessing the witness's credibility. We disagree.

As Wallace notes, Evidence Code section 780 permits jurors to consider various matters in assessing credibility, including a witness's ability to perceive or recall events, whether the witness has made prior inconsistent statements, and the witness's character for honesty or dishonesty.[4] The court's instructions to the jury reflected this rule. In our view, there is no reasonable likelihood the jurors construed the prosecutor's comments about intoxication to mean they should not evaluate T.S.'s testimony in accordance with these general principles governing witness credibility.

The prosecutor did not argue jurors should not consider how well T.S. could perceive or recall the events about which she testified. The prosecutor did suggest that jurors should not "automatically" disbelieve a victim or

---

[4] Evidence Code section 780 states in part: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶] (c) The extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies. [¶] (d) The extent of his opportunity to perceive any matter about which he testifies. [¶] (e) His character for honesty or veracity or their opposites. [¶] . . . [¶] (h) A statement made by him that is inconsistent with any part of his testimony at the hearing."

witness who was under the influence of alcohol or drugs. In connection with that point, the prosecutor referred to Juror 3's response during voir dire that a person's marijuana use would negatively affect her view of the person's character. It was permissible for the prosecutor to urge jurors not to adopt that approach. And as the Attorney General notes (as Wallace concedes in reply), Juror 3 was excused during voir dire, so this case does not present the particular concerns raised when a prosecutor quotes an individual sitting juror during closing argument. (See *People v. Freeman* (1994) 8 Cal.4th 450, 517–518 [improper, but harmless, for prosecutor to quote a sitting juror during argument; "[i]f counsel should not address individual jurors by name, they should similarly not quote individual jurors"]; *People v. Riggs* (2008) 44 Cal.4th 248, 324–326 [improper, but harmless, for prosecutor to use a chart with quotes from individual jurors, in part because it could pressure jurors to conform their verdict to their earlier statements].) Similarly, the prosecutor's questions during voir dire—which we read as an effort to explore jurors' attitudes about a witness's alcohol or marijuana use—did not improperly suggest to jurors that a witness's intoxication could not or should not be considered at all in assessing credibility.

We acknowledge there is some ambiguity in the prosecutor's statement in her rebuttal argument that jurors should not "hold it against" T.S. that she had been drinking and smoking marijuana, and it is puzzling that the prosecutor linked this argument to a supposed "promise[]" by jurors that they would not do so.[5] But in the context of the prosecutor's argument as a whole,

---

[5] Neither party has pointed us to a passage in the transcript of the voir dire proceedings where the prosecutor asked for such a promise. Instead, as noted, during voir dire, the prosecutor asked prospective jurors questions about how a witness's alcohol or drug use would affect the jurors' assessment of the witness's credibility or character.

we do not think there is a reasonable likelihood the jurors construed or applied this comment in an objectionable fashion. (See *People v. Morales, supra,* 25 Cal.4th at p. 44.) The comment followed the prosecutor's suggestion that jurors should not "automatically" discount (or refuse to believe) a witness's testimony because of intoxication. And the prosecutor did not argue the converse—that T.S. should automatically be believed. Instead, as noted, the prosecutor argued at length that the evidence supported T.S.'s credibility. In this context, there is no reasonable likelihood the jurors construed the prosecutor's statement that they should not "hold it against" T.S. that she consumed alcohol and marijuana as an assertion that a witness's intoxication could not be considered at all in assessing credibility. We find no misconduct and no basis for reversal.[6]

Finally, although it is not necessary to our decision, the court's instructions bolster our conclusion that no reversible error occurred. The court instructed the jurors (with CALCRIM No. 226) that they alone were to judge the credibility of witnesses, using their "common sense and experience." Consistent with Evidence Code section 780, the instruction stated jurors could consider any factor that reasonably tended to prove or disprove the truth or accuracy of a witness's testimony, including the witness's ability to perceive or remember events and any prior inconsistent statements. In other instructions, the court emphasized that "[n]othing that the attorneys say is evidence" and that "[i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." In our view,

---

[6] Because we have addressed and rejected Wallace's claim of prosecutorial misconduct, we need not address the parties' arguments as to whether Wallace's trial counsel was ineffective in failing to preserve the claim by objecting to the statements that Wallace now seeks to challenge on appeal.

there is no reasonable likelihood the jurors construed the prosecutor's remarks about intoxication or credibility (which, again, were tied to a review of the evidence) as a claim that they should not evaluate T.S.'s testimony as instructed by the court.

### B. *The Upper Term Sentence on Count 1*

Wallace contends the court erred when it imposed the four-year upper term for the count 1 corporal injury conviction, because the court relied on aggravating factors that were not proven beyond a reasonable doubt, relied on Wallace's lack of remorse, and failed to consider mitigating evidence. We conclude the court properly imposed the upper term.

### 1. Additional Background

As noted, the jury did not find, and was not asked to find, the aggravating factors that were alleged in the information, including that the crime involved great violence or great bodily harm (rule 4.421(a)(1)), the victim was particularly vulnerable (rule 4.421(a)(3)), and Wallace took advantage of a position of trust (rule 4.421(a)(11)). In a bifurcated court trial, the court found beyond a reasonable doubt that Wallace suffered the four prior convictions alleged in the information.

In her sentencing recommendation, the prosecutor recommended imposition of the upper term on count 1 and argued Wallace's prior convictions were numerous or of increasing seriousness under rule 4.421(b)(2). Noting the jury did not make findings on other aggravating factors, the prosecutor stated she was "solely relying" on rule 4.421(b)(2). The prosecutor stated, however, that she believed other aggravating factors had been proven at trial, including the great violence, vulnerable victim, and position of trust factors. (Rule 4.421(a)(1), (3), (11).)

17

At the sentencing hearing on September 8, 2022, the court imposed the four-year upper term for the count 1 conviction of corporal injury to a relationship partner (§ 273.5, subd. (a)). Referring to rule 4.421(b)(2) (the defendant's prior convictions are "numerous or of increasing seriousness"), the court found Wallace's prior convictions were numerous and stated it was imposing the upper term based on that finding. The court stated: "Factors in aggravation related to the defendant, under 4.421(b)(2), the defendant's prior convictions as an adult are numerous or of increasing seriousness. I find that they are numerous. [¶] The defendant's prior convictions are numerous. . . . For this reason the Court is imposing the aggravated term for Count 1." The court outlined Wallace's four prior felony convictions between 1998 and 2011 and stated three of them resulted in prison sentences, including a 2009 conviction for corporal injury to a relationship partner under section 273.5, subdivision (a), the same offense for which he was convicted in the present case.

The court stated that, although it was relying on Wallace's numerous convictions under rule 4.421(b)(2) to impose the upper term, the present crime involved great violence and great bodily harm within the meaning of rule 4.421(a)(1). The court stated: "Although the Court is sentencing the defendant to the aggravated term based on the aggravating factor that I just mentioned, which is his—which is the defendant's prior convictions as an adult are numerous, I would also note that this crime did involve great violence and bodily harm and the defendant was convicted for this identical offense and served two years in state prison for it on the previous conviction for the 273.5.

"With regard to that factor—and as I indicated, I'm relying on the numerous convictions, but the Court must note that the crimes in this case

18

under 4.421(a)(1) involve great violence, great bodily harm, and acts displaying a high degree of callousness. The defendant's actions against the victim, [T.S.], evidenced great violence against a woman who is much smaller than him, 178 pounds, and he was 350 pounds at the time of the offense." The court stated the trial evidence showed T.S. was violently assaulted in the apartment and had to escape by jumping from a third-floor window, sustaining significant injuries.

The court also stated: "Apparently, to this day the defendant has no remorse for the harm caused by his actions, and he told the probation officer as recently as September 1st of 2022, 'I just feel like I was wrongly convicted for something I didn't do.'"

The court found no circumstances in mitigation.

**2. Analysis**

Wallace argues that, by imposing the upper term, the court violated the rules governing determinate triad sentencing set forth in section 1170, subdivision (b), as amended by Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567),[7] legislation that took effect on January 1, 2022.[8] We disagree.

"Senate Bill 567 amended section 1170, subdivision (b) to specify that, when a sentencing court chooses a term from a statutory triad, the chosen term shall not exceed the middle term, unless the facts supporting the aggravating circumstances are (1) established by the defendant's stipulation

---

[7] Wallace cites Assembly Bill No. 124 (2021–2022 Reg. Sess.) on this point, but it is Senate Bill 567 that made the relevant changes to section 1170. (*People v. Jones* (2022) 79 Cal.App.5th 37, 44, fn. 11.)

[8] As noted, Wallace was sentenced in September 2022, after Senate Bill 567 had taken effect. This case does not involve retroactive application of Senate Bill 567.

19

to them, (2) proven to a jury (or to a court, if jury is waived) beyond a reasonable doubt, or (3) based on prior convictions evidenced by a certified record of conviction.  (Stats. 2021, ch. 731, §§ 1.3, 3(c), adding Pen. Code, § 1170, subd. (b)(1)–(3).)"  (*People v. Jones*, *supra*, 79 Cal.App.5th at p. 44.) "Senate Bill 567 also added a provision that requires the court to impose the low term if the defendant's psychological, physical, or childhood trauma was a contributing factor in the commission of the offense, 'unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice.'  (Stats. 2021, ch. 731, § 1.3, adding Pen. Code, § 1170, subd. (b)(6); see Stats. 2021, ch. 731, § 3(c).)"  (*Ibid.*)

The court's selection of the upper term for count 1 did not violate section 1170, subdivision (b).  First, as to the proof requirements for the facts underlying aggravating circumstances (§ 1170, subd. (b)(1)–(3)), the court stated repeatedly that it was relying on Wallace's numerous prior convictions (rule 4.421(b)(2))—which included four felony convictions—to impose the upper term.  The court could properly consider the convictions themselves both because they were proven beyond a reasonable doubt to the court in a bifurcated bench trial (§ 1170, subd. (b)(2)) and because they were based on certified records of conviction (*id.*, subd. (b)(3)).  And beyond the bare fact that the convictions occurred, in our view the court had authority under section 1170, subdivision (b)(3) to determine at sentencing that Wallace's convictions were "numerous" within the meaning of rule 4.421(b)(2).  (*People*

*v. Wiley* (2023) 97 Cal.App.5th 676, 685, review granted Mar. 12, 2024, S283326.)[9]  The court had a proper basis to impose the upper term.

Wallace argues that, because the trial court discussed other factors (including the circumstances of the present crime and the great violence factor in rule 4.421(a)(1)), the court must be found to have improperly relied on aggravating factors that were not proven in conformance with section 1170, subdivision (b).  We disagree.  As noted, the court repeatedly emphasized it was relying on Wallace's numerous prior convictions under rule 4.421(b)(2) as the basis for selecting the upper term.  That the court *also* stated its views about the present crime (such as that it involved great violence under rule 4.421(a)(1)) does not show error.

In a similar argument, Wallace suggests the court improperly relied on his lack of remorse as an aggravating factor.  But again, the court's mention of Wallace's lack of remorse provides no basis to disregard the court's statement that it was relying on Wallace's prior convictions in imposing the upper term.

In addition to the proof requirements in section 1170, subdivision (b)(1)–(3), Wallace suggests the court failed to weigh mitigating evidence and did not comply with the requirement in section 1170, subdivision (b)(6) that, in some circumstances, a sentencing court is to treat

---

[9] In *Wiley*, we concluded that, under both the Sixth Amendment and section 1170, subdivision (b)(3), "the prior conviction exception" to the heightened proof requirements for aggravating factors "includes both the fact of a prior conviction and 'other related issues' [citation] that may be determined from a certified record of conviction." (*People v. Wiley, supra,* 97 Cal.App.5th at p. 685, rev. granted; see *id.* at pp. 682–683, 686.)  The California Supreme Court granted review on this question.  (*People v. Wiley*, review granted Mar. 12, 2024, S283326.)  Pending further guidance from the California Supreme Court, we will adhere to our decision in *Wiley*.

21

the *lower* term in a triad as the presumptive sentence.[10]  He also asserts the trial court did not understand the scope of its sentencing discretion under section 1170, subdivision (b).  We find no error.

The record does not support any suggestion that the court misapprehended the scope of its discretion or improperly ignored mitigating evidence.  As discussed, the court stated it was imposing the upper term based on Wallace's prior convictions (while also stating the present crime was a serious one) and stated it found no mitigating factors were present.  The court stated it had considered the rules of court pertaining to aggravating and mitigating factors (rules 4.421 and 4.423).  The court also noted it had received and considered the probation report and the sentencing briefs filed by the parties, as well as defense counsel's submission of letters from Wallace's family members and friends.  The court also "had an opportunity to listen to and observe every witness and view all the evidence that was presented during the trial."  That the court ultimately found no factors in mitigation related to the crime or to the defendant (see rule 4.423) provides no basis to conclude the court ignored or improperly discounted any of the evidence presented to it.

On appeal, Wallace suggests certain brief passages in the probation report—relaying statements by Wallace that his mother had been addicted to crack cocaine in the past, and that Wallace had consumed alcohol and

---

[10] Section 1170, subdivision (b)(6) states in part:  "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence."

marijuana—supported a presumptive low term under section 1170, subdivision (b)(6)(A). But the trial court was not obligated to infer from these statements that Wallace had suffered trauma of the type that would trigger the section 1170, subdivision (b)(6)(A) presumption. And we note the probation report also relayed statements by Wallace that he had a " 'pretty regular' " childhood; he was not subjected to mental, physical, or sexual abuse as a child or teenager; and he was not dependent on alcohol or addicted to illegal drugs.[11]

Because we conclude the court did not err in imposing the upper term for count 1, we need not address Wallace's argument that the purported error was prejudicial. And, since we have considered Wallace's challenges to his sentence on the merits (rather than holding they were forfeited), we need not consider his contention that his trial counsel was ineffective for failing to preserve the claims for appeal.

## C. *The Stayed Sentence on Count 2*

The court imposed an eight-month term for the false imprisonment charge in count 2 and stayed that term under section 654. The eight-month term is incorrect. Eight months is one third of the two-year middle term applicable to the count 2 conviction for false imprisonment by violence, which

---

[11] The California Supreme Court's recent decision in *People v. Salazar* (2023) 15 Cal.5th 416 (*Salazar*), which Wallace cites in his reply brief, is inapposite. In *Salazar*, the defendant was sentenced before Senate Bill 567 took effect, and the Attorney General conceded Salazar may have suffered a qualifying trauma that would trigger the new low term presumption in section 1170, subdivision (b)(6). (*Salazar*, at p. 419.) Because there was no clear indication in the record that the trial court would have imposed the same sentence if it had been aware of the scope of its discretion under current law, the Supreme Court concluded the case should be remanded for resentencing. (*Ibid.*) Here, as noted, Senate Bill 567 took effect before Wallace's sentencing, and the court properly applied current law.

is punishable by a term of 16 months, two years, or three years.  (§§ 236, 237, subd. (a), 1170, subd. (h)(1).)  But the "one-third-the-midterm rule of section 1170.1, subdivision (a), only applies to a consecutive sentence, not a sentence stayed under section 654." (*People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164.)  The correct approach would be to impose one of the three full terms applicable to the offense (16 months, two years, or three years) and stay execution of that sentence under section 654 (without making any determination whether the term should run concurrently or consecutively).

As to the remedy, if we were to remand for a new sentencing hearing, it "would mean pulling defendant out of his prison programming and busing him to [court] for a new sentencing hearing that will not change his actual prison time.  The futility and expense of such a course militates against it." (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1473.)  Instead, we will exercise our authority to modify the judgment.  (§ 1260; see *Alford*, at p. 1473.)  On count two, we will impose the three-year upper term (§§ 236, 237, subd. (a), 1170, subd. (h)(1)), because "that is undoubtedly the sentence the trial court would have imposed" (*Alford*, at p. 1473), based on the court's explanation of its decision to impose the upper term for count 1.  (See *Salazar, supra,* 15 Cal.5th at p. 419 [if the trial court did not understand the scope of its sentencing discretion, remedy is to remand for resentencing unless the record clearly indicates the conclusion the court would have reached had it been aware of its discretion].)  We will stay execution of the sentence on count 2.  (§ 654.)

### III. DISPOSITION

The judgment is modified to impose a three-year term (rather than an eight-month term) for count 2 and to stay that sentence pursuant to

24

section 654.  The trial court is directed to prepare an amended abstract of judgment reflecting that modification.  The court shall forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  As so modified, the judgment is affirmed.

STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
HITE, J.*

---

* Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.